UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEANETTE L. DIXON,

                         Plaintiff,              Case No. 12-13461
                                                Honorable John Corbett O'Meara
                                                Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                         Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]**

Plaintiff Jeanette L. Dixon ("Dixon") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 13], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Dixon is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Dixon's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

**II.      REPORT**

     **A.      Procedural History**

On May 15, 2009, Dixon filed an application for SSI, alleging disability beginning on

May 1, 2008.  (Tr. 98-103).  Her claim was denied initially on October 1, 2009.  (Tr. 62-65).

Thereafter, Dixon filed a timely request for an administrative hearing, which was held on

November 9, 2010, before ALJ David Gatto.  (Tr. 43-60).  Dixon (represented by attorney Carl

Anderson) testified at the hearing, as did vocational expert ("VE") Frank Mendrick.  (Tr. 47-59).

On December 15, 2010, the ALJ issued a written decision finding that Dixon was not disabled.

(Tr. 29-39).  On June 29, 2012, the Appeals Council denied review.  (Tr. 1-4).  Dixon filed for

judicial review of the final decision on August 7, 2012 [1].

      **B.**    **Background**

          *1.*    *Disability Reports*

In a May 15, 2009 disability field office report, Dixon reported that her alleged onset date

was May 1, 2008.  (Tr. 121).  The claims examiner noted, during a face-to-face interview, that

Dixon had difficulty walking but was "very pleasant" and did not have trouble talking,

answering questions, understanding, or concentrating.  (Tr. 122-23).

In a June 4, 2009 disability report, Dixon indicated that her ability to work was limited by

major depression, stroke, back problems, and high blood pressure.  (Tr. 125).  When describing

how these conditions limited her ability to work, Dixon stated:

> I am very sleepy from my high blood pressure pills.  I am a little slower
> since I had my stroke.  I have extreme back pains.

(Tr. 126).  Dixon reported that these conditions began to interfere with her ability to work in

2008, and that she became unable to work on May 1, 2008.  (*Id.*).  When asked why she stopped

working, Dixon said only, "I do not remember."  (*Id.*).

Dixon completed eleventh grade (apparently taking special education classes) but had no

further education.  (Tr. 130, 139).  Prior to stopping work, Dixon worked as a cashier and food

service worker at various fast food restaurants.  (Tr. 126, 132).  In the job she held the longest

(cashier at Dairy Queen), she was required to walk, stand, and reach eight hours per day, and write, type, or handle small objects four hours per day. (Tr. 127). She was frequently required to lift 10 pounds. (*Id.*).

Dixon indicated that she had treated with Dr. Lourdes Andaya and had also been seen at New Center Community Mental Health Services ("New Center"). (Tr. 128-29). At the time of the report, she was taking clonidine (which made her "sleepy"), hydrochlorothiazide, and Motrin (for pain). (Tr. 129). Dixon further reported that she had undergone various unspecified medical tests. (Tr. 130).

In a function report dated June 26, 2009, Dixon reported that she was living in her landlord's house with her boyfriend. (Tr. 140). When asked to describe her daily activities, Dixon indicated that she watches television, takes her medication, and sits on the porch during the course of a day. (*Id.*). With her boyfriend's help, she is able to feed her dog. (Tr. 141). Her conditions interfere with her sleep: she states that she is "to [sic] much in pain to sleep." (*Id.*). She needs help getting out of the bathtub because of her back pain, and she needs reminders to take medication. (Tr. 141-42). Dixon is able to prepare meals every other day, although she no longer cooks "complete meals." (Tr. 142). She is able to do housework, including taking out the trash, washing dishes, and washing clothes (by hand). (*Id.*). She goes outside every day and is able to walk, ride a bicycle, and use public transportation. (Tr. 143). She does not drive because she is "scared of driving." (*Id.*). She goes shopping for food and clothes every two weeks, and she is able to pay bills, count change, and handle savings and checking accounts. (*Id.*). Her hobbies include watching television and doing puzzles (which she does "a lot"), sewing, and cooking. (Tr. 144). She spends time with others when she is not in pain or asleep and does not have any problems getting along with family, friends, or neighbors. (Tr. 144-45).

3

When asked to identify functions impacted by her conditions, Dixon checked lifting, squatting, bending, standing, walking, sitting, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, and following instructions.  (Tr. 145).  She can walk one block before needing to stop and rest for five minutes, and she cannot pay attention for very long "at all."  (*Id.*).  She has trouble following both written and spoken instructions and finishing what she starts.  (*Id.*).  She gets along with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 147).  She does not handle stress or changes in routine well and is afraid of being unable to care for herself.  (*Id.*).

In a third party function report dated June 26, 2009, Dixon's boyfriend, Darnell Slocum, reported that Dixon does not do very much during the day because of "her illness (back pain) and a slight memory lost [sic] after her minor stroke."[1]  (Tr. 148).  According to Slocum, Dixon has a hard time bending over (because of her back pain) and needs help getting out of the bathtub.  (Tr. 149).  She is able to prepare "quick" meals every other day, clean and do laundry, and shop for clothing and household products.  (Tr. 149-50).  According to Slocum, Dixon spends time with others, sitting and talking or playing cards.  (Tr. 152).  She has a hard time attending "outings" with friends and family because she is in "constant pain and can't see or remember."  (Tr. 153).

In a March 9, 2010 disability appeals report, Dixon reported that her condition had not changed since the time of her last report.  (Tr. 160).  At that time, she was taking two new medications for pain – "Forsdo" and Norco – neither of which produced any side effects.  (Tr. 161).  She indicated that she could not walk or sit for long periods of time, or keep up with

---

[1] Dixon has reported at various times suffering a "stroke" in January of 2009.  As discussed more fully below, however, there is no medical evidence in the record that she indeed suffered a stroke.  Although Dixon was seen in the emergency room in January of 2009, she was merely suffering from temporary blurred vision in one eye and was diagnosed with "amaurosis fugax" (Tr. 183), which is a transient episode of monocular blindness, or partial blindness, lasting ten minutes or less.  *Dorland's Illustrated Medical Dictionary* 53 (28th ed. 1994).

housework, because of back pain.  (Tr. 162).

### 2.  *Dixon's Testimony*

At the November 9, 2010 hearing before the ALJ, Dixon testified that she completed the eleventh grade, but did not obtain a high school diploma or GED.  (Tr. 47-48).  At the time of the hearing, she was homeless and had been "staying in an abandoned building" for the past month.  (Tr. 48-49).  She began experiencing back pain in 2005, which gradually worsened.  (Tr. 50-51).  She has not worked since 2008, when she was employed as a fast food worker at Popeye's.  (Tr. 49).  She left that job because the medication she was taking for high blood pressure "caused [her] to go to sleep."  (*Id.*).  Presently, she experiences back pain "every day all day" and rates that pain as a 10/10 on the pain scale.  (Tr. 51-52).

When asked to describe her typical day, Dixon indicated that she takes her medications and basically sleeps all day.  (Tr. 50).  She has some days "where [she] can't get out of bed" and other days when all she can do is move to a chair.  (*Id.*).  She testified that she has crying spells and hears voices every day.  (Tr. 52).  She can sit for 30-45 minutes before she needs to get up, and she can stand for 15 minutes before needing to sit down.  (Tr. 53-54).  She cannot walk a full block without stopping and can lift five to ten pounds with her right hand only.  (Tr. 54).

At the time of the hearing, Dixon was taking Zoloft, nitroglycerin, Desyrel, naproxen, Vicodin, Hydrodiuril, Imdur (which gave her a headache) and Catapres (which made her sleepy).  (Tr. 49, 56).  She testified that she was seeing a physician at New Center and, for the past five or six months, had also been seeing a physician (but not a therapist) at Detroit East to obtain medications.  (Tr. 48, 50).

### 3.  *Medical Evidence*

#### (a)  *Physical Impairments*

With respect to Dixon's back pain, there are few medical records in evidence.  There is a

Detroit Medical Center emergency room record dated April 21, 2009, where Dixon complained of chronic back pain. (Tr. 173-75). On examination, she had a negative straight leg raise test. (Tr. 174). No diagnostic tests were performed. She was provided with pain medication and told to follow up with her primary care physician. (Tr. 175). On July 15, 2009, Dixon saw a physician at the Henry Ford Hospital emergency department, against complaining of non-radiating back pain. (Tr. 179). A musculoskeletal examination revealed no musculoskeletal pain and a non-tender back. (*Id.*). Again, she was diagnosed with back pain and prescribed pain medication. (Tr. 181).[2]

On September 1, 2009, Dixon underwent a consultative physical examination. (Tr. 224-31). At the examination, Dixon complained of localized back pain. (Tr. 224). However, the musculoskeletal examination revealed no abnormalities, and an x-ray of the lumbar spine was normal. (Tr. 225, 227). Dixon was diagnosed with chronic back pain and the consultative examiner, Dr. Shaw, opined that she was capable of working eight hours per day; sitting, standing, walking, and bending minimally; and lifting 5-10 pounds. (Tr. 225).[3]

### (b)  *Mental Impairments*

With respect to Dixon's mental impairments, as the ALJ noted, there are limited treatment records in evidence. It appears that Dixon first sought treatment at New Center in December of 2006, when she was diagnosed with major depressive disorder, single episode, severe without psychotic features and polysubstance dependence. (Tr. 203). Dixon was

---

[2] It is worth noting that, at this emergency room visit, Dixon's psychiatric history was described as "negative for anxiety and depression." (Tr. 179).

[3] On October 1, 2009, a state agency single decisionmaker completed a Physical Residual Functional Capacity Assessment, concluding that Dixon could perform the full range of medium, unskilled work. (Tr. 232-39). The ALJ did not give any weight to this assessment, however, concluding that Dixon's medical record "shows greater limitation than the medium work limitation determined by the State Agent." (Tr. 37).

subsequently terminated by New Center in January of 2008 due to missed appointments.  (*Id.*).

Dixon again sought treatment at New Center in July of 2009.  She reported that her depression began in approximately 2002, when her children were removed from her custody by child protective services because she was abusing crack cocaine.  (Tr. 195).  At her initial psychiatric examination on July 24, 2009, Dixon complained of symptoms of feeling sad, depressed, helpless, tired, and having visual and auditory hallucinations.  (Tr. 200).  She denied delusions and perceptual disturbances, was alert and oriented with intact memory, and exhibited average intelligence.  (Tr. 201).  She was diagnosed with major depressive disorder, recurrent, severe, without psychotic features, as well as polysubstance abuse in remission, assigned a Global Assessment of Functioning ("GAF") score of 50,[4] and prescribed Zoloft.  (*Id.*).

Beyond these limited records from New Center, there are no other treatment records in evidence concerning Dixon's mental condition.  Specifically, despite the fact that Dixon testified at the hearing that she was then seeking mental health treatment at "Detroit East," and despite the fact that the ALJ left open the record to allow for the submission of these medical records, Dixon did not submit (at any step of these proceedings) any records from "Detroit East."

On September 2, 2009, Daniel Blake, Ph.D., reviewed Dixon's records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique. (Tr. 205-22).  Dr. Blake noted that Dixon suffers from an affective disorder (as defined in Listing 12.04) and a substance addiction disorder (as defined in Listing 12.09).  (Tr. 212, 217).  Dr. Blake opined that Dixon is mildly limited in her activities of daily living and social functioning,

---

[4]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

and moderately limited in maintaining concentration, persistence, and pace.[5]  (Tr. 219).  Dr.

Blake concluded, however, that Dixon retained sufficient mental functions for "sustained work

activity."  (Tr. 207).

### 4.    Vocational Expert's Testimony

Frank Mendrick testified as an independent vocational expert ("VE").  (Tr. 57-59).  The

ALJ asked the VE to imagine a claimant of Dixon's age, education, and work experience, who

was limited to light, unskilled work, with only occasional climbing of stairs and ramps, stooping,

kneeling, crouching, or crawling; frequent balancing; and no climbing of ladders, ropes, or

scaffolds.  (Tr. 58).  The VE testified that the hypothetical individual would be capable of

performing Dixon's past relevant work as a cashier or fast food worker.  (Id.).  In addition, the

VE testified that the hypothetical individual also would be capable of working in the positions of

final assembler (2,000 jobs in Michigan), table worker (1,200 jobs in Michigan), and hand

laborer (1,800 jobs in Michigan).  (Id.).

### 5.    Evidence Submitted to the Appeals Council

Attached to Dixon's motion for summary judgment were documents she previously

submitted to the Appeals Council, including a January 15, 2012 Intelligence Testing and

---

[5] Specifically, in his RFC Assessment, Dr. Blake opined that Dixon is not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple or detailed instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers without distracting them; maintain socially appropriate behavior; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  (Tr. 205-06).  Dr. Blake further opined that Dixon is moderately limited in the ability to maintain attention and concentration for extended periods; complete a normal workday and work week without interruptions from psychological symptoms; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Id.).

Psychosocial Assessment (which evaluated Dixon's employability) and a January 9, 2012 Mental RFC Assessment, both completed by Elaine Tripi, Ph.D. (Doc. #11 at Ex. 1-2). Dr. Tripi found that Dixon has a full scale IQ of 71, which places her in the borderline range of intelligence. (*Id.* at Ex. 1, p. 2). Dr. Tripi also found that Dixon showed poor remedial skills in reading, spelling, and math. (*Id.*). Ultimately, Dr. Tripi concluded that Dixon "is not a viable rehabilitation candidate, nor is she capable of sustaining substantial gainful work activity." (*Id.* at Ex. 1, p. 3). Dr. Tripi also completed a Mental RFC Assessment, in which she opined that Dixon is moderately and markedly limited in many categories. (*Id.* at Ex. 2).

### C.      Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

9

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Commissioner of Soc. Sec.*, 2011 WL 6937331, at \*7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Commissioner of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps…. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Secretary of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Dixon is not disabled under the Act.  At Step One, the ALJ found that Dixon has not engaged in substantial gainful activity since May 15, 2009, the application date.  (Tr. 31).  At Step Two, the ALJ found that Dixon has the severe impairments of:  history of chronic back pain, hypertension, obesity, and major depressive disorder.[6]  (*Id.*).  At Step Three, the ALJ found that Dixon's back impairment does not meet or medically equal Listing 1.04 (for disorders of the spine), and her mental impairment does not meet or medically equal Listing 12.04 (for affective disorders) or Listing 12.09 (for substance addiction disorders).  (Tr. 32-33).

The ALJ then assessed Dixon's residual functional capacity ("RFC"), concluding that she is capable of performing unskilled, light work with frequent balancing; only occasional climbing of stairs/ramps, stooping, kneeling, crouching, and crawling; and no climbing of ropes, ladders, or scaffolds (due to obesity).  (Tr. 33-38).  At Step Four, the ALJ determined, based in part on

---

[6] The ALJ also found that Dixon's history of drug and alcohol abuse is a non-severe impairment, and her alleged "stroke" (which is not documented in the medical records) is a non-medically determinable impairment.  (Tr. 31).  Dixon does not challenge these conclusions.

the VE's testimony, that Dixon's RFC was consistent with her past relevant work as a cashier and fast food worker.  (Tr. 38).  Although the ALJ therefore determined that Dixon was capable of performing her past relevant work, he alternatively found, at Step Five, based in part on the VE's testimony, that Dixon is capable of performing a significant number of other jobs that exist in the national economy.  (Tr. 38-39).  As a result, the ALJ concluded that Dixon is not disabled under the Act.  (Tr. 39).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Commissioner of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to

evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Commissioner of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

In his written decision, the ALJ found that Dixon has several severe impairments – including a history of chronic back pain, hypertension, obesity, and major depressive disorder – which impose limitations on her ability to work. (Tr. 31-33). The ALJ then concluded that Dixon has the RFC to perform unskilled, light work with frequent balancing; only occasional climbing of stairs/ramps, stooping, kneeling, crouching, and crawling; and no climbing of ropes, ladders, or scaffolds. (Tr. 33-38).

Dixon argues that the ALJ's RFC finding failed to accurately portray her credible mental limitations. Specifically, Dixon argues that the ALJ failed to properly develop the record, and

that the ALJ's RFC finding failed to properly take into account her moderate limitations with respect to concentration, persistence, and pace.  Dixon further argues that the Commissioner failed to transmit Dr. Tripi's records to this court and, as a result, erred in not providing a complete record for consideration by this court.[7]  Lastly, Dixon argues that, in light of the records from Dr. Tripi, which were not considered by the ALJ, her case should be remanded pursuant to sentence six of 42 U.S.C. §405(g).  Each of these arguments will be discussed in turn.

### 1.   The ALJ's RFC Finding is Supported by Substantial Evidence

#### (a)   The ALJ Did Not Fail to Properly Develop the Record

Dixon first argues that the ALJ erred, after commenting on the "paucity of treatment notes in the record concerning [her] mental condition," to take steps to further develop the record.  (Doc. #11 at 9-10).  Specifically, Dixon challenges the fact that the ALJ gave her "just 21 days" to procure treatment records from Detroit East – where Dixon testified she had been receiving services for several months – rather than procuring those records himself and/or ordering a consultative examination.  (*Id.* at 10).

As an initial matter, the court notes that Dixon's contention that the ALJ acted improperly in giving her "just 21 days" to attempt to procure her records from Detroit East mischaracterizes the exchange between the ALJ and Dixon's hearing attorney regarding these records.  While the ALJ did ask Dixon's attorney to submit the records within twenty-one days (which her attorney indicated he would do), he specifically added, "If you need more time just send me a letter."  (Tr. 60).  There is no indication in the record that Dixon ever submitted the

---

[7] In her motion for summary judgment, Dixon also argues that the Appeals Council erred in failing consider Dr. Tripi's records.  (Doc. #11 at 13-16).  In response, however, the Commissioner pointed out that the Council's "Notice of Appeals Council Action" indicates that these materials were in fact considered.  (Doc. #13 at 24-25).  Consequently, Dixon withdrew this particular argument (Doc. #14 at 5), and the court need not addressed it further.

Detroit East records to the ALJ or to the Appeals Council, nor did she request an extension of time to do so.  Thus, Dixon's attempt to deflect blame for her own failure to submit the Detroit East records is misplaced.[8]

In a similar vein, Dixon argues that the ALJ had an independent duty to develop the record by procuring the records at issue, pointing out that social security proceedings are "inquisitorial rather than adversarial."  (Doc. #11 at 9-10) (citing *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000)).  As the Sixth Circuit has held, however, a social security claimant "carries the burden of establishing disability."  *Wilson v. Commissioner of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008).  Thus, the general rule is that the claimant is responsible for furnishing the medical and other evidence supporting her application for benefits.  *See* 20 C.F.R. §416.912(a).  Although exceptions to this general rule exist in certain circumstances, courts have recognized that an ALJ only has a "special, heightened duty" to develop the administrative record when the claimant is without counsel, incapable of presenting an effective case, and unfamiliar with hearing procedures.  *See Wilson*, 280 F. App'x at 459 (citing *Lashley v. Secretary of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).  According to the *Wilson* court, "Absent such special circumstances … this court repeatedly affirms that the claimant bears the ultimate burden of proving disability."  *Id.* at 459.  In this case, where Dixon does not (and cannot) contend that any of the "special circumstances" apply, her argument that the ALJ should have procured her treating records from Detroit East is without merit.

Dixon also argues, almost in passing, that the ALJ erred in failing to order a consultative examination, especially when Dr. Shaw (the consultative physical examiner) "suggested the

---

[8] Moreover, even if Dixon had submitted records from Detroit East, it is unlikely they would have shed much light on her mental impairment.  Dixon testified that she did not see a therapist at Detroit East, but merely went there once a month to get medication.  (Tr. 48).

propriety of getting one."  (Doc. #11 at 10) (citing Tr. 226).  To begin with, Dixon's counsel never requested that a consultative mental examination be conducted.  And, even if such a request had been made, it is clear that the applicable social security regulations do not *require* the ALJ "to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990) (internal quotations omitted); *see also* 20 C.F.R. §416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests.") (emphasis added).

In this case, the ALJ had sufficient evidence to make a determination regarding the limitations resulting from Dixon's mental impairment.  Although Dixon asserts that "the ALJ pointed out that there were scarce mental treatment notes in the record" (Doc. #11 at 10), she takes this statement out of context in asserting that, with this statement, the ALJ was conceding that he lacked sufficient evidence to make a determination regarding her mental impairment. Rather, what the ALJ actually said was:  "With respect to her mental condition, there are limited treatment notes for this condition.  One would expect an individual who has disabling depression to have a steady treatment history with a psychiatrist or therapist."  (Tr. 36).  It appears, then, that the ALJ was simply noting that Dixon's mental impairment was not so severe as to warrant extensive treatment.  He was not, as Dixon asserts, concluding that the record contained insufficient medical evidence to permit him to make a determination as to her mental impairment.

Looking at the ALJ's decision as a whole, his determination regarding the limitations imposed by Dixon's mental impairment is supported by substantial evidence.  As the ALJ

pointed out, Dixon had access to medical services (and, indeed, saw physicians at New Center and Detroit East to obtain medication refills), but she did not see a therapist. (Tr. 35). The ALJ discussed Dixon's initial psychiatric evaluation at New Center, where Dr. Swarn Mahajan noted that Dixon was neatly and appropriately dressed and cooperative, with normal motor activity, intact memory, and average intelligence. (Tr. 36, 201). She was alert and oriented and she denied delusions and perceptual disturbances. (Tr. 201). Similarly, the ALJ relied on the assessment of Dr. Blake, the state agency psychologist, who opined that, despite Dixon's moderate limitations in various concentration, persistence and pace categories (Tr. 37-38, 205-206), she retained sufficient mental functions for "sustained work activity." (Tr. 38, 207). The ALJ also considered Dixon's own statements, made in a Function Report, that she cooked simple meals, used public transportation, shopped for food and clothes, did "a lot" of puzzles, watched television, and sewed. (Tr. 37, 141-44). Because the record contains sufficient evidence for the ALJ to evaluate the limitations resulting from Dixon's mental impairment, he was not required to order a consultative examination.

In sum, the ALJ did not fail to properly develop the record regarding Dixon's mental impairment.

        *(b)*    *The ALJ's RFC Finding Adequately Accommodated Dixon's Moderate Limitations in Concentration, Persistence, and Pace*

Dixon next argues, based on the ALJ's Step Three determination that she has moderate difficulties with respect to concentration, persistence, and pace ("CPP"), as well as Dr. Blake's mental RFC assessment, that the ALJ's RFC finding was inaccurate. Specifically, Dixon argues that the ALJ's RFC finding should have included limitations that corresponded with Dr. Blake's notations in Section I of the Mental RFC Assessment, where he checked boxes indicating that Dixon was moderately limited in her ability to maintain attention and concentration for extended

16

periods, complete a normal workday and workweek without interruptions caused by psychological symptoms, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.  (Doc. #11 at 11-12 (citing Tr. 205-06)).

As the Commissioner correctly points out, however, Dixon's argument misapprehends the purpose and function of the different sections of the Mental RFC Assessment form.  Section I of the form is "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." Program Operation Manual System (POMS) DI 24510.060(B)(2)(a) (emphasis in original). Section III, entitled "Functional Capacity Assessment," contains the mental RFC assessment of the state agency psychiatrist.  *See* POMS DI 24510.060(B)(4)(a).  POMS is viewed as persuasive authority in this circuit, and other courts have rejected arguments similar to Dixon's – that the ALJ should have incorporated Section I findings into the RFC analysis.  *See Joiakim v. Commissioner of Soc. Sec.*, 2011 WL 1120043, at *6 (E.D. Mich. Mar. 8, 2011) ("Section I of the mental assessment is merely a worksheet and does not constitute the RFC assessment.") (citing cases).  Here, as in *Joiakim*, the ALJ's conclusion that Dixon can perform "unskilled work" is consistent with Dr. Blake's opinion (in Section III of the Mental RFC Assessment) that Dixon retains the RFC to perform "sustained work activity."  (Tr. 207).  Thus, the ALJ did not err in failing to incorporate Dr. Blake's Section I notations into his RFC analysis.

Citing *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), and *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005), Dixon also argues that the ALJ's mental RFC finding – which limited her to unskilled work – does not adequately address her moderate CPP limitations.  (Doc. #11 at 12).  This is a frequently litigated issue in the Eastern District of

17

Michigan.  It is true that, in certain situations, courts have held that limiting a claimant to "simple," "unskilled," or "routine" work is insufficient to address CPP deficiencies.[9]  It is equally true, however, that courts have held that, under some circumstances, limitations similar to those imposed by the ALJ in the instant case adequately account for such deficiencies.  *See, e.g., Bohn-Morton v. Commissioner of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) (finding that "unskilled" work limitation in RFC was sufficient to account for ALJ's finding that claimant "often" experiences issues with CPP); *Edmunds v. Commissioner of Soc. Sec.*, 2010 WL 3633768, at *8 (E.D. Mich. Aug. 17, 2010) (substantial evidence supported ALJ's finding that claimant with moderate CPP deficiencies could perform "simple, routine, repetitive" work).

There is no bright-line rule requiring remand whenever an ALJ's RFC finding (and subsequent hypothetical) includes a limitation to "unskilled work" but does not contain a more specific concentration-related limitation.  *See Jones v. Commissioner of Soc. Sec.*, 2012 WL 4355532, at *9 (E.D. Mich. Sept. 24, 2012); *Caradine v. Commissioner of Soc. Sec.*, 2013 WL 388729, at *7 (E.D. Mich. Jan 11, 2013).  Rather, the court must look at the record as a whole and determine whether substantial evidence supports the RFC.  *See Jones*, *supra* at *9; *Caradine*, *supra* at *7; *Lewicki v. Commissioner of Soc. Sec.,* 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks.  Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

In *Hess v. Commissioner of Soc. Sec.*, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008), the court considered the adequacy of the ALJ's conclusion that the plaintiff retained the

---

[9] *See, e.g., Benton v. Commissioner of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007); *Green v. Commissioner of Soc. Sec.*, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009).

RFC to perform "simple routine tasks in a low stress environment."  In that case, as here, the state agency doctor completed both a Psychiatric Review Technique Form ("PRTF"), finding that the plaintiff had a moderate CPP limitation, and a Mental RFC Form, finding that the plaintiff had moderate limitations in several concentration-related categories.  *Id.* at *7.  However, as is also the case here, the doctor ultimately concluded that the plaintiff retained the ability to perform unskilled tasks on a sustained basis.  *Id.* at *4.  The *Hess* court concluded that because the ALJ relied on the state doctor's finding of a moderate impairment with respect to CPP, it was reasonable for the ALJ to rely on that doctor's ultimate conclusion that the plaintiff could perform unskilled work on a sustained basis and, accordingly, to omit a more specific, concentration-based limitation from the hypothetical.  *Id.* at *8.  Many recent Eastern District of Michigan cases have been similarly decided.  *See e.g., Young v. Commissioner of Soc. Sec.*, 2011 WL 2601014, at *10 (E.D. Mich. May 23, 2011) ("Although Plaintiff correctly cites the moderate limitations noted in the assessment, Plaintiff fails to mention that the same assessment also concluded that Plaintiff is 'capable of unskilled work.'"); *Taylor v. Commissioner of Soc. Sec.*, 2011 WL 2682682, at *8 (E.D. Mich. May 17, 2011) ("[T]his Court finds that Dr. Marshall's findings that Plaintiff has moderate limitations in concentration, persistence, and pace have to be considered in conjunction with his ultimate conclusion (twice reached) that, despite the concentrational limitations, Plaintiff could perform unskilled work on a 'sustain[ed] basis.'"); *Seach v. Commissioner of Soc. Sec.*, 2011 WL 1792666, at *8 (E.D. Mich. Apr. 6, 2011) ("The undersigned concludes that the ALJ's determinations regarding Plaintiff's mental impairments are fully supported by the substantial evidence in the administrative record.  In this matter, the State Agency examiner specifically stated that Plaintiff's 'psychological limitations do not appear to interfere with potential for work activities that are simple in nature.  [Plaintiff] retains

19

the capacity for simple tasks on a sustained basis.'"); *Lewicki*, 2010 WL 3905375, at *3 ("Plaintiff's objection ignores a particularly compelling piece of evidence provided by the same state psychologist who diagnosed Plaintiff's mental limitations in the first place. The psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work.").

Likewise, in this case, the ALJ's limitation of Dixon to unskilled work adequately reflects Dr. Blake's opinion that Dixon was moderately limited with respect to CPP. On the same form in which he indicated that Dixon had moderate CPP limitations, Dr. Blake opined that Dixon could perform "sustained work activity." (Tr. 207). As in *Hess* and *Lewicki*, the ALJ's finding of a moderate CPP limitation should be considered in conjunction with Dr. Blake's broader conclusion, which suggests that Dixon could successfully perform unskilled work. *See also De-Giber v. Commissioner of Soc. Sec.*, 2012 WL 6966653, at *9 (E.D. Mich. Oct. 24, 2012); *Carlin v. Commissioner of Soc. Sec.*, 2013 WL 639338, at * (E.D. Mich. Jan 11, 2013) (the ALJ's RFC limitation of plaintiff to simple, routine work was sufficient where state psychologist concluded that plaintiff was moderately limited with respect to CPP but retained the capacity to "perform simple, routine tasks on a sustained basis"). Thus, under the facts of this case, by expressly limiting Dixon to "unskilled work," the ALJ adequately accounted for Dixon's moderate CPP limitations.

### 2.   *Dixon is Not Entitled to a Sentence Six Remand*

Dixon also argues that, pursuant to sentence six of 42 U.S.C. §405(g), the court should remand the case to the ALJ for consideration of Dr. Tripi's records. (Doc. #11 at 17-19). Remand to consider additional evidence is appropriate only when the evidence is new and material, and good cause is shown as to why it was not presented at the prior proceeding. *See* 42 U.S.C. §405(g); *Willis v. Secretary of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).

Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). Here, the medical records at issue reflect testing conducted by Dr. Tripi in January 2012. Thus, the records can be considered "new" evidence, as they did not exist at the time of the November 9, 2010 hearing. (Doc. #11 at Ex. 1, 2). However, even if Dixon could establish "good cause" for her failure to submit these records sooner, she has failed to demonstrate that these records are "material."[10]

Courts have held that additional evidence is material only if it pertains to the claimant's condition prior to the date of the ALJ's decision; evidence of a subsequent deterioration in that condition provides no basis for remand. *See Oliver v. Secretary of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1984); *Sizemore v. Secretary of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988). Moreover, evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 712.

In this case, Dixon has failed to establish that Dr. Tripi's records are "material" under these standards. As an initial matter, Dr. Tripi assessed Dixon's mental state as of January 2012,

---

[10] "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. As this court recently recognized, "'Good cause' is *not* established solely because the new evidence was not generated until after the ALJ's decision; the Sixth Circuit has taken a 'harder line' on the good cause test." *Richardson v. Commissioner of Soc. Sec.*, 2012 WL 4210619, at *4 (E.D. Mich. Aug. 27, 2012) (citing *Oliver v. Secretary of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)) (emphasis in original). A plaintiff attempting to introduce new evidence "must explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision." *Richardson*, 2012 WL 4210619, at *4. Here, Dixon's only explanation as to why she failed to obtain and submit records from Dr. Tripi sooner consists of a casual statement that "current counsel did not represent plaintiff at the hearing, and therefore could not have sent plaintiff to Dr. Tripi sooner." (Doc. #11 at 18). While this court is not persuaded that this explanation demonstrates "good cause," as noted, it is a moot point in light of the court's findings as to the evidence's materiality.

more than one year after the ALJ issued his decision. On their face, then, Dr. Tripi's records do not purport to relate to the time period relevant to this case. Dixon argues that Dr. Tripi's conclusions (particularly with respect to her IQ score) would fairly assess her mental condition prior to the ALJ's decision because there is "no reason to assume that [her] IQ changed appreciably in a year's time." (Doc. #11 at 19). As the Commissioner correctly points out, however, this argument cuts both ways: assuming that Dixon's IQ remained fairly constant throughout her life (as Dixon alleges in her brief), then her IQ did not prevent her from performing her past relevant work as a cashier or fast food worker. Where the ALJ specifically concluded that Dixon could perform her past relevant work, as well as other unskilled work, such conclusions are consistent with the alleged limited level of intellectual functioning identified by Dr. Tripi. Moreover, the court notes that the Appeals Council had Dr. Tripi's records before it when it denied Dixon's request for review. *Supra* fn. 7.

For all of these reasons, Dixon has not established a reasonable probability that the Commissioner would have reached a different conclusion on the issue of disability if presented with the new evidence. As such, Dixon is not entitled to a sentence six remand.[11]

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Dixon's Motion for Summary Judgment [11] be

---

[11] Dixon also argues that the case should be remanded because the Commissioner failed to include Dr. Tripi's records in the administrative record that was transmitted to this court. (Doc. #11 at 16-17). As the Commissioner correctly points out, however, Dr. Tripi's records were considered by the Appeals Council and were provided to this court by Dixon as an attachment to her motion for summary judgment. (Doc. #11 at Ex. 1, 2). Courts have held that "an incomplete or imperfect transcript can justify remand only if the claimant was prejudiced on the merits." *Jones v. Commissioner of Soc. Sec.*, 2011 WL 1527159, at *10 (E.D. Tenn. Apr. 4, 2011). Here, where the court has before it the records at issue, Dixon has not been harmed by their absence from the official transcripts.

DENIED, and the ALJ's decision be AFFIRMED.


Dated: March 28, 2013                    s/David R. Grand
Ann Arbor, Michigan                      DAVID R. GRAND
                                         United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 28, 2013.

                                         s/Felicia M. Moses
                                         FELICIA M. MOSES
                                         Case Manager